USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-1181 RANDY JORDAN, Plaintiff, Appellant, v. HAWKER DAYTON CORPORATION and EAST DAYTON TOOL & DIE CO., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT  FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Cyr, Boudin, and Lynch, Circuit Judges. ______________ ____________________ Laurie Ann Miller, with whom N. Laurence Willey, Jr. and Ferris, _________________ _______________________ _______ Dearborn & Willey were on brief, for appellant. _________________ Brent A. Singer, with whom David C. King and Rudman & Winchell ________________ _____________ __________________ were on brief, for appellee Hawker Dayton Corporation. ____________________ August 10, 1995 ____________________ LYNCH, Circuit Judge. Randy Jordan, an injured LYNCH, Circuit Judge. _____________ worker, appeals, asking us to revisit the law of Maine on successor liability so that he may reach the Hawker Dayton Corporation, which purchased the assets of a division of another company that had manufactured the machinery which injured Jordan's hand. Sitting as a court in diversity jurisdiction under Erie Railroad v. Tompkins, 304 U.S. 64 _____________ __ ________ (1938), we decline to do so and affirm the grant of summary judgment issued in favor of Hawker Dayton Corporation by the district court.  FACTS _____ In September 1991, the appellant, Randy Jordan, badly injured his hand at work while attempting to unjam a doweling machine. Jordan underwent medical and psychological treatment, and filed this products liability action in the United States District Court for Maine against "Hawker Dayton Manufacturing Company." The doweling machine was manufactured in 1973 by Hawker Manufacturing Company ("Hawker Manufacturing"), a division of East Dayton Tool & Die Co. ("East Dayton"). East Dayton also manufactured automobile components and other products. Around the time that the doweling machine was manufactured, Dorothy Darrow, the sole shareholder of East Dayton, sold some of her stock to family friends, and East Dayton redeemed her remaining stock for cash and an -2- 2 installment note. The company continued its manufacturing operations and even added additional product lines. In August 1973, East Dayton sold to Harmon Darrow, the president of Hawker Manufacturing, an option to purchase the assets of Hawker Manufacturing at their net book value. In March 1974, Mr. Darrow formed Hawker Dayton Corporation ("Hawker Dayton"), conveyed his option to that company, and in July 1974, Hawker Dayton exercised the option and purchased the Hawker Manufacturing assets for approximately $150,000. Hawker Dayton continued the operations of Hawker Manufacturing and continued to use the Hawker Manufacturing trade name. East Dayton continued to manufacture woodworking machines (including doweling machines at first), automobile dies and other specialized machinery for about two years. In 1976, East Dayton defaulted on its note to Ms. Darrow. It then sold the rest of its equipment for $925,000 and its real property for $650,000 to entities not involved in this lawsuit, and made payments out to Ms. Darrow on the installment note for the next ten years. PROCEEDINGS BELOW _________________ On June 14, 1993, Jordan filed this suit. In August, the district court issued a scheduling order giving a deadline of September 15, 1993, for amendment of the pleadings. The judge later amended the scheduling order, extending the deadline for amending pleadings by fifteen days -3- 3 and extending the discovery deadline by two months. During discovery, Jordan learned, inter alia, that East Dayton was _____ ____ the manufacturer of the doweling machine. On February 10, 1994, five days before discovery was to be completed under the scheduling order, Jordan moved to correct the corporate name of the defendant from "Hawker Dayton Manufacturing Corporation" to "Hawker Dayton Corporation," to add East Dayton as a defendant and to include additional theories of liability against Hawker Dayton. The district court granted the motion to correct the corporate name of the defendant and to add East Dayton, but denied the motion to add additional theories of liability. Jordan filed a motion for summary judgment on the issue of whether Hawker Dayton was liable as a successor corporation for the debts and liabilities of East Dayton. Hawker Dayton objected, and in its response asked that summary judgment be entered in its favor instead. The Magistrate Judge recommended that Jordan's motion be denied, and the district court adopted the recommendation. Neither ruled on the issue of whether summary judgment should be entered on behalf of Hawker Dayton. Hawker Dayton subsequently moved for summary judgment, and the district court granted the motion. Judgment by default was entered against East Dayton, after a hearing on damages, for $2,230,088.21. -4- 4 Jordan appeals the grant of summary judgment in favor of Hawker Dayton on the issue of successor liability. DISCUSSION __________ Four years ago, albeit in a different context than a tort suit, the Supreme Judicial Court of Maine held, as to corporate successor liability: "[A]bsent a contrary agreement by the parties, or an explicit statutory provision in derogation of the established common law rule, a corporation that purchases the assets of another corporation in a bona fide, arm's-length transaction is not liable for _________ the debts or liabilities of the transferor corporation." Director of Bureau of Labor Standards v. Diamond Brands, ________________________________________ __ ________________ Inc., 588 A.2d 734, 736 (Me. 1991). Diamond Brands involved ____ ______________ interpretation of the term "employer" in a severance pay statute. Conceding that there is no contrary agreement by the asset purchase parties and no statutory exception to common law here, Jordan tries to avoid the Diamond Brands ______________ holding by arguing the opinion does not foreshadow what the Maine Court would do in a tort action.  There are two responses. First, the rule, as stated above, that a mere asset purchase will not give rise to successor liability is articulated by Maine's highest court as being "the established common law rule." That alone defeats Jordan's claim, as he has argued that Maine law applies. This common law rule is reinforced by the social -5- 5 policy judgment made by the Maine legislature, in the statute at issue in Diamond Brands. Maine there decided that it is ______________ benefited by not discouraging purchases of assets of Maine businesses through imposition of successor liability on purchasing corporations, thus keeping businesses going which would otherwise fail, and so continuing to have employees benefit from their continued employment. Id. at 737 n.7. ___ Jordan points to no legal developments in the law of successor liability in Maine or in any other jurisdiction since Diamond Brands to suggest that the Supreme Judicial _______________ Court would change this law. See Bernhardt v. Polygraph Co. ___ _________ __ _____________ of America, 350 U.S. 198, 205 (1956) ("[T]here appears to be __________ no confusion in the [Maine] decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of [Maine] judges on the question, no legislative development that promises to undermine the judicial rule."). Thus, Diamond _______ Brands is the law of Maine, and this Court must apply that ______ law. Secondly, plaintiff chose a federal, rather than a state forum, presumably cognizant of this court's statement that "litigants who reject a state forum in order to bring suit in federal court under diversity jurisdiction cannot expect that new trails will be blazed." Ryan v. Royal ____ __ _____ Insurance Company of America, 916 F.2d 731, 744 (1st Cir. _____________________________ -6- 6 1990). Jordan did not file a motion that the issue be certified to the state court. Here Jordan has suffered an injury and East Dayton appears to no longer have assets with which to satisfy his claim. But the complex policy arguments as to whether the common law should strive to assure him recompense are left to the state, not the federal court, to decide. Here Maine has made that calculus and given the greater weight to the protection of jobs through limits on successor liability. It is not the role of the federal courts to "question the policy choices of states whose law we apply." Krauss v. Manhattan Life Insurance Company of New ______ __ _________________________________________ York, 643 F.2d 98, 102 (2d Cir. 1981). ____ Jordan argues that the Supreme Judicial Court recently adopted a "majority rule" in another aspect of tort law and so will adopt the majority rule as to successor liability. Jordan relies on Oceanside at Pine Point __________________________ Condominium Owners Association v. Peachtree Doors, Inc., 659 ______________________________ __ ______________________ A.2d 267, 270 (Me. 1995), which held that a plaintiff did not state a claim in tort for a defective product's damage to itself, thus having Maine join that rule adopted by a majority of jurisdictions. Even were we incorrect in our understanding that the law of Maine on successor liability has been determined by its highest authority, this argument would not assist Jordan. The Peachtree Doors decision does _______________ not expand plaintiffs' remedies, but reflects a rejection of -7- 7 such an expansion. More tellingly, even if Maine were to adopt a "majority rule" as to successor liability, Jordan would still not prevail. Assuming the majority rule to be that a corporation which purchases assets from another is not liable in tort for the actions of the transferor unless one of four exceptions is met, see, e.g., 1 American Law of ___ ____ ________________ Products Liability 7:1 at 10-11 (3d ed. 1990), those ___________________ exceptions avail Jordan naught. See also Ohio Bureau of _________ _______________ Workers' Compensation v. Widenmeyer Electric Co., 593 N.E.2d _____________________ __ ________________________ 468, 470 (Ohio 1991); Ramirez v. Amsted Industries, Inc., 86 _______ __ _______________________ N.J. 332, 340, 431 A.2d 811, 815 (1981); Ray v. Alad Corp., ___ __ __________ 19 Cal.3d 22, 28, 560 P.2d 3, 7 (1977). There was no agreement by Hawker Dayton, express or implied, to assume the liabilities of East Dayton Tool and Die Co., and Jordan does not claim that the asset sale was fraudulent, not made in good faith, or made without sufficient consideration. There was no de facto merger nor a mere continuation of the predecessor here where the transferor corporation, East Dayton, neither dissolved nor liquidated after the asset sale. See, e.g., 1 American Law of Products Liability, ___ ____ _____________________________________ supra, 7:10, 7:12, 7:14 & 7:15 (both merger or _____ consolidation and mere continuation exceptions require that there be only one corporation at the end of the transaction). Indeed East Dayton sold less than 10% of its assets to Hawker -8- 8 Dayton, continued to do business thereafter and paid out on an installment note for twelve years after the asset sale. Jordan's argument ultimately is that the "product line" doctrine of successor liability should be adopted. Under the product line doctrine, a corporation that purchases all or substantially all of the assets of another corporation, continues the manufacturing operations and sells the same product line may be strictly liable for injuries caused by defective products in that line. See, e.g., 1 ___ ____ American Law of Products Liability, supra, 7:25 at 42; see __________________________________ _____ ___ also Ray, 19 Cal.3d 22, 560 P.2d 3; Ramirez, 86 N.J. 332, 431 ____ ___ _______ A.2d 811 (1981); Dawejko v. Jorgensen Steel Company, 290 Pa. _______ __ _______________________ Super. 15, 434 A.2d 106 (1981); Martin v. Abbott ______ __ ______ Laboratories, 102 Wash.2d 581, 689 P.2d 368 (1984). It is ____________ far from clear the product line doctrine would assist Jordan. See, e.g., Ray, 19 Cal.3d at 31; 560 P.2d at 9; Ramirez, 86 ___ ____ ___ _______ N.J. at 358, 431 A.2d at 825 (the product line exception requires that the asset purchase destroy the plaintiff's remedy, for example, because all of the assets are purchased or because the purchase agreement requires the predecessor to liquidate). This doctrine is at most a minority rule which has plainly not been adopted by Maine. Finally, Jordan makes a procedural argument that the court was precluded from entering summary judgment for Hawker Dayton because it failed to do so when Hawker Dayton -9- 9 had countered his motion in part by saying that it, not Jordan, was entitled to entry of judgment. The court originally denied Jordan's motion and took no action on Hawker Dayton's counter request. When Hawker Dayton later filed a formal motion for summary judgment in its favor, the court granted it, saying it had not considered the merits of Hawker Dayton's request when it denied Jordan's motion. There was no error in this procedure and would have been none even if the court had considered the counter request the first time around. See Burns v. Massachusetts Institute of ___ _____ __ ___________________________ Technology, 394 F.2d 416, 418 (1st Cir. 1968). Nor was there __________ an abuse of discretion in denying Jordan's motion to amend his complaint filed more than four months after the deadline set in the scheduling order and only a few days before discovery was to be completed. The decision of the district court granting summary judgment to Hawker Dayton is affirmed. -10- 10